The State National Bank of Springfield

*v.*

Salome E. Butler.

*Filed at Springfield April 2, 1894.*

1. Partnership—*evidence—written contract.* Where- a partnership is claimed to exist, not in writing, the intention of the parties is a material fact, to be ascertained from their conduct and declarations; but when the agreement is in writing, its true construction must be determined from the terms of the written instrument, and from that construction it is to be found whether a partnership exists.

2. By a certain written agreement A sold to B a one-fourth interest in a mine, then being open and operated by A. The agreement created the relation of co-owners of the mine, and the relation of joint proprietors in the business of operating the mine. It gave A the entire management and control of all matters in connection with the mine, and to each the right to participate in the profits, and required each to bear losses proportionately. The writing provided for the payment of royalties to A on the coal hoisted. The agreement was recorded: *Held,* that as to third persons this agreement created a partnership between A and B, and that its record was notice to the world of the relations between A and B.

3. Those persons are partners who contribute either property or money to carry on a joint business for their joint benefit, and who own and share the profits thereof, in certain proportions. If they do this, the consequence follows that the acts of one in conducting the partnership business are the acts of all, and that each shall receive a part of the profits, and take part of the fund to which the creditors of the firm have a right to look for the payment of their debts, and that all are liable as partners upon contracts made by any of them with third persons, within the scope of the partnership business, and that even an express stipulation between them that one shall not be so liable, though good between themselves, is ineffectual as against third persons.

4. Contract—*its written terms must alone show its intent.* An agreement, when reduced to writing, must be presumed to speak the intention of the parties who sign it. It speaks for itself, and the intention with which it was executed must be determined from the language used to express that intention. It is not to be changed by extrinsic evidence as to how it was understood or what was intended.

5. Same—*ignorance of its contents—execution without knowing its terms.* A woman of education, able to read and write, who deliberately signs a written agreement without informing herself as to the nature of

its contents, so that such agreement may be used to the prejudice of third persons who may give credit on the strength of it, can not be permitted to allege, as a matter of defense, her ignorance of that which it was her duty to know, when the means of information were within immediate reach, of which she failed to avail herself.

6. RECORDING LAW—*instruments entitled to record.* An agreement in writing, whereby one party sells to the other a one-fourth interest in a coal mine opened and being operated, and which makes them partners in the operation of the mine, sharing proportionately in the profits and losses, is an instrument which is entitled, by law, to be recorded, and the record of the same will be notice to third persons dealing with the parties, of their relation to each other. The subject matter of such agreement is either real estate or a chattel real,—the agreement conveying an interest, if not in real estate, yet in a chattel real.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

Appellant brought its action of assumpsit in the circuit court of Sangamon county on a promissory note signed "Speed Butler & Co.," alleged to have been executed March 17, 1885, by Speed Butler, Salome E. Butler and Henry W. Butler, as partners, under name and style of Speed Butler & Co. The note is for the sum of $6898.81, payable on demand, with interest at the rate of eight per cent per annum. The declaration avers the death of Speed Butler, and stated the cause of action as against appellee and Henry W. Butler. Subsequently, in the circuit court, the cause was dismissed as to Henry W. Butler, and the declaration amended accordingly. Appellee, as sole defendant, filed pleas, the general issue, and a special plea denying partnership and joint liability with Speed Butler in his lifetime, both pleas verified by affidavit. The issue, as made by both pleas and to be found from the evidence, is as to whether there was a partnership existing between Speed Butler and the appellee at the time of the execution of the note. The plaintiff, to make out its case, offered in evidence the following written instrument:

"This agreement, entered into this . . . . . day of May, A. D. 1881, between Speed Butler, as trustee of Annie S. Butler, Fannie E. Butler and Arnold W. Butler, of the county of Sangamon and State of Illinois, the party of the first part, and Salome E. Butler, trustee, of the same place, the party of the second part:

"*Witnesseth*, that the party of the first part sells to the party of the second part, in consideration of the sum of $13,000 and the agreements of the parties hereinafter mentioned, the one-fourth interest in the coal mine known as the 'Black Diamond Mine,' situated on the south-east quarter of section 4, township 15, north, range 5, west, third principal meridian, in the county of Sangamon and State of Illinois, under the conditions following:

"*First*—One-quarter of one cent on each bushel of coal, to be deducted and paid to Speed Butler at the end of every month, on all coal hoisted and sold in said month, as royalty, and this amount as royalty to be paid before anything else is paid from the proceeds of said mine.

"*Second*—Speed Butler to have entire management and control of all matters in connection with the mine.

"*Third*—A full and satisfactory settlement to be made at the end of each month, and whatever losses or gains of that month, to be divided,—one-fourth of such gains or losses to belong to Salome E. Butler, and the remainder to belong to Speed Butler.

"*Fourth*—All coal to be taken from under the land belonging to the heirs of said Speed Butler, and no coal to be taken out of said shaft from any other source, without the full consent and approval of said Speed Butler.

"*Fifth*—In case of the death of said Speed Butler, his executor, administrators or trustees to have the same authority as he himself now has in the premises.

"*Sixth*—If at any time this quarter interest now sold in said mine is to be re-sold, Speed Butler is to have the right to be

37—149 ILL.

first purchaser, if he so desires, at whatever price may be offered by any other *bona fide* purchaser; and this quarter interest can not be re-sold to any party that may be objectionable to said Speed Butler.

"*Seventh*—If, at any time, it should be considered by the parties advisable to connect tile works with said mine, the expenses of so doing will be in the same proportion as one to three, and the profits or losses therefrom will likewise be in the same proportion.

"In witness whereof the parties have hereunto set their hands and seals the day and year first above written.

SPEED BUTLER,    [Seal.]<br>SALOME E. BUTLER, [Seal.]"

"The party of the first part hereby agrees to watch over and protect this interest in the same manner as though it belonged to himself.        SPEED BUTLER."

The signatures to this instrument were shown to be those of Speed Butler and appellee.

The cashier of the appellant bank testified that Speed Butler had for some years been running a coal mine near the city of Springfield, Illinois, and kept an account with the bank in the name of Speed Butler & Co., and borrowed money, from time to time, of the bank, and the note in suit was a renewal of the aggregate amount of several smaller notes theretofore made, the first of which loans included in those smaller notes was made in November, 1881. The first knowledge the cashier had of the written agreement was derived from Speed Butler, who gave him information because of which he examined the records and read the agreement as recorded; that as an officer of the bank he conducted for the bank the negotiations between it and Speed Butler & Co. for the loans, and he did not believe Speed Butler was responsible financially, but believed appellee was wealthy and responsible; that appellee lived within six blocks of the bank, and he fre-

quently saw her, but never said anything in reference to the partnership; that he had seen the bill-heads of the firm of Speed Butler & Co., with the names of Speed Butler and Wirt Butler as the partners, and did not remember whether Salome Butler's name was on any of those bill-heads.

Joseph Bunn, a clerk in the bank, testified to frequent loans made to Speed Butler & Co., and about the time of those loans, and produced from the letter files of the bank a letter written and signed by Speed Butler on his personal business, which letter was written on a sheet of paper with the letter head of Speed Butler & Co. printed thereon, and in the upper left hand corner the name of Speed Butler was printed, and the name under it, S. E. Butler.

The testimony of H. W. Butler is, that he entered the employ of Speed Butler, who was engaged in running a coal mine, and after he had been so engaged for some time it was contemplated between Speed Butler and himself that they would enter into a partnership, and with that object in view he was there from December, 1880, until the summer of 1881, and it was during that time that the bill heads were printed and the style of firm established of Speed Butler & Co., and the name of the partners printed thereon as Speed Butler and H. W. Butler; that the proposed partnership was never consummated, but the business was thereafter carried on under the name of Speed Butler & Co.; that whilst he was in the service of Speed Butler he was engaged about the office and in charge of much of the business, and had a general knowledge of the transactions, and appellee was in no way connected with the business. He further states, after examining the bill-head on which the letter of Speed Butler identified by Bunn was offered in evidence, that the said letter was written on paper on which the bill-heads were printed when it was proposed that he should become a partner, and that from an inspection his initials, "H. W.," were attempted to be erased

and the initials "S. E." written in their place; that he had
knowledge of the business as clerk, book-keeper and salesman.

The appellee testifies that she never knew the contents of
the instrument offered in evidence until October or November,
1884, and never had possession of a paper purporting to con-
vey to her an interest in a coal mine, and providing she should
be a sharer in its losses. She further states: "I first learned
of that paper from brother Wirt, (Henry Wirt Butler,) who
brought it to me and said he got it from my brother Speed
(Butler). On or about the month of May, 1881, my brother
Speed was indebted to me about $3500, exclusive of interest,
for money lent. He was to give me security on the mine and
the works, and premises about, for the debt. He gave me a
paper, saying it was security to me, but I don't know that the
paper (Exhibit 2) is the same. He asked me to sign it. I
signed it. I didn't read it. I signed it because I had perfect
confidence in my brother and supposed it was all right. He
asked me to sign it, as being necessary to giving me security.
I would not have signed it if I had known what it really was.
I never had any thing to do with the mine—was never there,
never to the office, never shared the profits or losses of the
business, never authorized any one to carry on the business
for me. Until this and other suits were brought I never heard
myself called a partner. I never heard my brother Speed, or
any one in the family, call me a partner. I never held myself
out as a partner. Neither principal nor interest of the moneys
borrowed from me by my brother Speed has been paid to me.
I never was consulted about the adoption of the firm name
Speed Butler & Co. I never claimed to be a partner, nor did
he ever claim, to my knowledge, that I was a partner. I lent
my brother (Speed) other money after he got the $13,000.
In October or November, 1884, I lent him $5000 more. He
gave me but the one paper as security." She testified that
she knew nothing of and never authorized the instrument to
be recorded.

William H. Staley, a clerk and book-keeper at the mine, for Speed Butler, from 1882 until his death, in 1885, testified that appellee's name never occurred in the business except in the purchase of coal for individual use, and Speed Butler stated that he had no partner. The testimony of Thomas Gray is similar to Staley's. Five other witnesses, who had many and continued transactions with Speed Butler & Co., testified that in all their transactions the name of appellee as a partner was never known.

Two contracts were entered into by Speed Butler to furnish coal for the State, and bonds for compliance therewith entered into by him, one in 1880, for two years, and one in 1882, for two years. On the first, Salome E. Butler was surety, and on the second, Salome E. Butler, Thomas Gray and P. W. Harts were the sureties. Some time prior to 1883 tile works were established in connection with the mine, and on October 5, 1883, Speed Butler sold and conveyed to one Ripley a half interest in the tile works, who entered into possession of that interest.

Numerous propositions of law were presented by plaintiff to be held, which, in effect, sought to draw the legal conclusion of the liability of appellee from the facts, and which were refused by the trial court.

The cause was tried before the judge, without a jury, and a finding and judgment entered for defendant, and the plaintiff appealed to the Appellate Court for the Third District, where the judgment was affirmed, and the plaintiff prosecutes an appeal to this court, and assigns as error the judgment of the Appellate Court in affirming the judgment of the circuit court.

Mr. JOHN MAYO PALMER, and Messrs. CONNOLLY & MATHER, for the appellant.

Mr. J. A. McCLERNAND, and Mr. W. J. BUTLER, for the appellee.

Mr. JUSTICE PHILLIPS delivered the opinion of the Court:

The question presented by the foregoing facts appearing in this record is, whether the appellee is liable to appellant as a partner of Speed Butler & Co. If such partnership existed, it was by reason of the written agreement signed by appellee and Speed Butler. Where a partnership is claimed to exist, not in writing, the intention of the parties is a material fact, to be ascertained from their conduct and declarations; but where the agreement is in writing, its true construction must be determined, and from that construction it is to be found whether a partnership exists. We shall only consider the written agreement in evidence in this case, in relation to the question as to what effect that agreement had between third parties and the signers of the agreement, and its construction in that connection.

By the terms of this agreement it appears that a mine was already opened for mining coal, which mine was known as the "Black Diamond Mine," and the tract of land on which it was opened was described, and by the terms used certain legal effects resulted, which may be summarized: First, it created between Speed Butler and Salome E. Butler the relation of co-owners of the coal mine; second, it created between them the relation of joint proprietors of the business of operating the mine; third, it created the relation of principal and agent between Salome E. Butler and Speed Butler for "the entire management and control of all matters in connection with the mine;" fourth, it gave to each the right to participate in the profits, and imposed upon each the duty of bearing proportionately the losses of the business of operating the mine. The instrument contained other terms, providing for the payment of royalties upon coal hoisted; limiting the sources from whence coal should be taken; making provision against the death of Speed Butler; forbidding the sale of the interest of Salome E. Butler without the consent of Speed Butler, and providing for

the enlargement of the business by constructing tile works, and for the payment of the expenses of their construction, and the division of the profits and losses of their operation. These provisions are each and all consistent with the general purpose of the agreement. The entire management and control of all matters in connection with the mine by Speed Butler, as provided in the agreement, was within the power of the parties to so contract. (1 Lindley on Partnership, (2d Am. ed.) p. 10; *Morse* v. *Richmond,* 97 Ill. 303.) The agreement providing for the proportionate interests of the signers of the agreement, and providing for the operation of the mine under the entire management and control of one of the signers of the agreement, and providing for a proportionate share in the profits or losses, creates their relation to third persons doing business with them, having knowledge of such agreement.

It is said in Lindley on Partnership, 55, that "tenants in common, or joint tenants of a mine or quarry, may or may not be partners, and the mine or quarry itself may or may not be a part of the common stock. But it is highly inconvenient, if not altogether impossible, for co-owners of a mine or quarry to work it themselves without becoming partners, at least in the profits of the mine; and persons who work a mine or quarry in common are regarded rather as partners in trade than as mere tenants in common of land. The co-owners of mines may be partners, not only in the profits, but also in the mine itself. The co-owners are then partners, to all intents and purposes, and their mutual rights and obligations are determined by the law of partnership, as distinct from the law of co-ownership."

In *Fougner et al.* v. *First Nat. Bank of Chicago,* 141 Ill. 124, the court cites with approval *Cox* v. *Hickman,* 8 H. L. 268, as follows: "It is often said that the test, or one of the tests, whether a person not ostensibly a partner is, nevertheless, in contemplation of law, a partner, is whether he is entitled to

participate in the profits. This, no doubt, is, in general, a sufficiently accurate test, for a right to participate in profits affords cogent, even conclusive, evidence that the trade in which the profits have been made was carried on, in part, for or on behalf of the person setting up such a claim. But the real ground of the liability is that the trade had been carried on by persons acting on his behalf. When that is the case, he is liable on the trade obligations, and entitled to its profits, or to a share of them. It is not strictly correct to say that his right to share in the profits makes him liable for the debts of the trade. The correct mode of stating the proposition is to say that the same thing which entitles him to the one makes him liable to the other, namely, the fact that the trade has been carried on in his behalf,—*i. e.*, that he stood in the relation of principal towards the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made." On thus quoting *Cox* v. *Hickman*, this court adds: "In the application of this rule many decisions are to be found by courts of last resort in this country, to the effect that notwithstanding a party may contract to receive a part of the profits of a business, he can not be held liable as a partner. On the other hand, many others—sometimes by the same courts—hold the contrary. These cases are all reconcilable, on the distinction that in the first class of cases there was a mere hiring of services, property or money to be paid for out of the profits of the business in which it was engaged, while in the latter there was a proprietary interest in the business."

It was held in *Mecham* v. *Valentine*, 145 U. S. 622: "In the present state of the law upon this subject it may perhaps be doubted whether any more precise general rule can be laid down than is indicated at the beginning of this opinion, that those persons are partners who contribute either property or money to carry on a joint business for their common benefit,

and who own and share the profits thereof in certain propor-
tions. If they do this, the incidents or consequences follow,
that the acts of one in conducting the partnership business
are the acts of all; that each is agent for the firm and for
the other partners; that each receives part of the profits as
profits, and takes part of the fund to which the creditors of
the partnership have a right to look for the payment of their
debts; that all are liable as partners upon contracts made
by any of them with third persons, within the scope of the
partnership business; and that even an express stipulation
between them that one shall not be so liable, though good
between themselves, is ineffectual as against third persons."

On considering this agreement under any of the authorities
above cited, it must be held that according to its terms it
clearly creates a partnership, and is to be so regarded and
treated by any person having notice thereof, doing business
with Speed Butler in the line of business by the agreement to
be done and performed. The agreement reduced to writing
must be presumed to speak the intention of the parties who
sign it. It speaks for itself, and the intention with which it
was executed must be determined from the language used to
express that intention. It is not to be changed by extrinsic
evidence as to how it was understood or what was intended.
*Gardt* v. *Brown*, 113 Ill. 475; *Lintner* v. *Millikin*, 47 id. 178;
*Fougner et al.* v. *First Nat. Bank, supra.*

Nor is appellee to be exempt from liability by reason of the
fact that she did not know the contents of the agreement, or
relied on the statement made by her brother as to its contents.
A woman of education, able to read and write, deliberately
signs a written agreement without informing herself as to the
nature of its contents, when that agreement may be used to
the prejudice of third persons who may give credit on the
strength of it, can not be permitted to allege, as a matter of
defense, her ignorance of that which it was her duty to know,

where the means of information were within immediate reach, of which she neglects to avail herself. (*Black* v. *Wabash Railway Co.* 111 Ill. 351.) And however the representations made by Speed Butler might affect the question as between himself and appellee, (was the question one between themselves,) if appellee permitted herself to be held out to the world as a partner, the rule is different where the rights of third persons are involved. In such case she is estopped from denying the existence of a partnership. *Niehoff et al.* v. *Dudley et al.* 40 Ill. 406.

The subject matter to which the agreement related—a coal mine already opened—was either real estate or a chattel real, and hence was an instrument that could properly be recorded, as it conveyed an interest, if not in real estate, yet in a chattel real, and when found on record by the cashier who examined the record, he could, from its terms, correctly deduce the conclusion that a partnership existed. By signing that agreement without examination, and putting it in the power of Speed Butler to put the same, so signed, on record, with a clause therein giving him "the entire management and control of all matters in connection with the mine," precludes her from insisting that she should have been consulted or inquired of by appellant before giving credit on her name. She can not be heard to say she did not act or do anything under the contract as a partner, for here again she was, by the terms of her contract, precluded from doing anything as an active member of the firm, and her not doing anything can create no presumption in her favor, as she had a right to legally so contract. The testimony of the cashier is, that he examined the agreement as recorded, and from that reached the conclusion that appellee was a partner, and gave credit accordingly, and but for that would not have extended farther credit to Speed Butler & Co., or advanced additional sums of money. Here is an agreement in writing, signed, which by its terms consti-

tutes a partnership,—an agreement concerning a subject matter rendering it proper that it should be recorded. The cashier of appellant examined that record to find if a partnership existed, before extending credit. The appellee, who signed the agreement without examination, put it in the power of Speed Butler to have the same recorded and procure credit because thereof. Appellant extended credit because of it, and if a loss is to be sustained it should not be sustained by appellant.

The fact Speed Butler and Salome E. Butler are each mentioned in the agreement as trustee, does not change the terms of the agreement or affect the notice. So far as appellee was concerned she is not described as a trustee for any person, and is sued in her individual and not in a representative capacity. With a partnership thus formed, no question as to the liability of the trust estate of any *cestui que trust* arises on this record. Neither does the fact that by the agreement no firm name was adopted, and no time the partnership was to continue was specified, render the agreement invalid.

Appellant asked the court to hold as law five different propositions, which sought to draw the legal conclusion, from the evidence, that a partnership existed, which were refused. With the evidence of the notice of the agreement had by appellant, each of those propositions should have been held, and it was error to refuse to hold the same.

We are of the opinion that the circuit court erred in its finding and entering judgment against the plaintiff, and the Appellate Court erred in affirming the judgment of the circuit court. The judgments of the circuit court and of the Appellate Court are reversed, and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE SHOPE, dissenting.